In the Matter of FUGAZY
EXPRESS, INC.

Zachary SHIMER, Chapter 7 Trustee of
Fugazy Express, Inc., and Metromedia
Company, Plaintiffs,

v.

William D. FUGAZY, Fugazy Limousine
Ltd. f/k/a R.F.D. Limousine Corp.
and Roy D. Fugazy, Defendants.

Bankruptcy No. 86 B 11206 (BRL).
Adv. No. 87–5883A.

United States Bankruptcy Court,
S.D. New York.

May 15, 1990.

Chadbourne & Parke, New York City (Zachary Shimer, of counsel), for Trustee.

Shea & Gould, New York City (Daniel L. Carroll, Thomas K. Reilly, of counsel), for Metromedia Co.

Anderson Russell Kill & Olick, P.C., New York City (Arthur S. Olick, of counsel), for William D. Fugazy.

Garrity & McCusker, New York City (James Lawrence Garrity and George Kuntu–Blankson, of counsel), for Roy Fugazy and Fugazy Limousine Corp.

## MEMORANDUM DECISION ON MOTIONS FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Chief Judge.

### BACKGROUND

On July 8, 1986 Fugazy Express, Inc. (the "Debtor") filed a voluntary petition for relief under Chapter 11, Title 11, United States Code, § 101 *et seq.* (the "Bankruptcy Code" or "Code"). The Debtor was engaged in the business of selling and servicing franchises for livery and limousine services to independent livery limousine operators who conducted their business using the "Fugazy" name. Under the franchise agreements, the Debtor was obligated to provide radio dispatching services on behalf of the franchisees. The radio dispatch transmissions were broadcast over various radio frequencies, for which the Debtor obtained the requisite licenses and permits from the Federal Communications Commission (the "FCC").

On March 25, 1987 this Court entered an Order converting the reorganization proceeding to a liquidation proceeding under Chapter 7 of the Code. Zachary Shimer was immediately appointed interim trustee of the Debtor's estate and became the permanent trustee (the "Trustee") at the meeting of the creditors held on June 17, 1987. On May 18, 1987 this Court entered an order authorizing the then interim Trustee to retain Jackson Hecht & Assoc., Inc. as auctioneers to conduct a sale of the Debtor's property. An auction was held on June 18, 1987. After the auction the Trustee transferred and assigned all of the Debtor's right, title and interest in and to the debtor's FCC licenses and permits to Metromedia Company ("Metromedia"), the only bidder on the licenses, for the sum of $500.

Without knowledge or authorization of this Court (*see* § 363 restrictions on transfer of property of the estate), and sometime prior to the auction sale, William D. Fugazy ("William Fugazy"), purporting to act in his capacity as Chairman of the Board of the Debtor, assigned and trans-

ferred to Fugazy Limousine Ltd., formerly known as R.D.F. Limousine Corp. ("Limousine") the following FCC radio frequency license and permit (the "License"):

| Call Sign | Frequencies |
|-----------|-------------|
| KXY 610   | 478.68750   |
|           | 481.68750   |

There is nothing in the record before this Court which indicates that the Debtor received any consideration for this assignment and transfer. At the time of the transfer, William Fugazy had no management responsibility for the Debtor, nor did he act in any capacity other than that occasioned by his status as a board member. The controlling shareholder of Limousine was Roy D. Fugazy ("Roy Fugazy"), who was also a former officer of the Debtor and the son of William Fugazy. Roy Fugazy accepted the unauthorized transfer of the License with knowledge of the bankruptcy and thereafter used the License in his business.

On January 28, 1987, Limousine filed an application requesting FCC approval for the assignment of authorization of the License from the Debtor to Limousine. The application was originally returned for lack of information, but was resubmitted. On April 15, 1987, the FCC consented to the assignment of the License and a new license in the name of Limousine was issued on April 30, 1987.

On August 18, 1987, the Trustee and Metromedia (the "Plaintiffs") commenced the present adversary proceeding against William Fugazy, Roy Fugazy, and Limousine (the "Defendants"). The Plaintiffs requested this Court to enter an order: (i) declaring the transfer by William Fugazy to Limousine to be null and void and directing the Trustee to effectuate the sale of the FCC License to Metromedia; (ii) declaring the transfer by William Fugazy to be in violation of the automatic stay and therefore null and void; (iii) finding all Defendants in contempt of court for a willful and flagrant violation of the automatic stay; (iv) declaring the transfer by William Fugazy to be an unauthorized post-petition transfer and therefore null and void under

§ 549 of the Code; (v) enjoining Limousine from using the License pending resolution of the complaint; and (vi) requiring Defendants to account for all monies received by them incident to the use of the License.

On September 10, 1988, this Court entered an order (the "Consent Order") that acknowledged the concession of William Fugazy that he acted without authority in purportedly assigning and transferring the Debtor's interest in the License to Limousine. The order also provided that the alleged assignment was null and void, and that Limousine acquired no legal or equitable rights or interests in the License. In addition, the order authorized and directed the Trustee to effectuate the sale of the License to Metromedia. The order was consented to by William Fugazy, the attorneys for William Fugazy, and the attorneys for Metromedia. The attorney for Limousine and Roy Fugazy appeared in this adversary proceeding at all pertinent hearings, including the one relative to the Consent Order, and was present in court and understood that the Consent Order signed by this Court declared that the assignment from the Debtor to Limousine was null and void.[1] Although substantive rights of Limousine and Roy Fugazy were adjudicated pursuant to the Consent Order, they never sought to modify it, or to appeal the order.

On August 18, 1987, an application for assignment of the License to the Trustee was filed by an attorney for Metromedia in the name of the Trustee. An FCC form letter dated October 14, 1987, returned the application for the following checked reasons:

There are several problems with your application:

1) You are attempting to assign station KXY 610. This station is licensed to RDF Limousine Corp. Fugazy Express is no longer the licensee. In order to assign the station the Commission would require a letter from RDF Limousine expressing their desire to transfer the license.

---

1. Hearing Transcript, April 25, 1989, pp. 36–37.

2) As an individual trustee you are "not" eligible to hold a license in the Taxicab Radio Service. Only those engaged in the taxi business may be licensed in the Taxicab Service. Therefore, you should reconsider your request to license.

Metromedia's attorney requested reinstatement of this application, but on March 3, 1988, the FCC denied the request and dismissed the application.

On October 27, 1987, this Court denied a motion to dismiss this adversary proceeding for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable herein pursuant to Bankruptcy Rule 7012(b)(6), and held that Metromedia was a proper party to this proceeding.

In response to a petition to revoke the assignment of FCC License KXY 610 from the Debtor to Limousine, by letter dated October 26, 1988, the FCC stated:

> While the rights and obligations of the various parties *vis-a-vis* each other may be somewhat complex, their obligations to the Commission are quite simple. Fugazy Express, Inc., licensee of record, assigned the license for KXY–610 to R.D.F. Limousine, who then became the licensee of record for our purposes. Information submitted to us, the Consent Order of the Bankruptcy Court in particular, casts doubt upon the validity of this transaction, and would under other circumstances require an administrative inquiry on our part. Here, however, the particular facts before us make such action unnecessary.
>
> Affidavits submitted with the pleadings establish that KXY–610 ceased operations in December, 1986. Under Section 90.157 of our Rules, 47 C.F.R. § 90.157, the license for KXY–610 has therefore cancelled and must be returned to the Commission. The frequencies will then be made available for reassignment.

It is undisputed that Limousine used the frequencies under License at least since the time of the attempted unauthorized assignment to it from William Fugazy, and continued to use the frequencies under the License until December 1, 1988, when the FCC granted a new Radio Call Sign License (WQU 550) for these frequencies to Limousine.

On March 1, 1989, Limousine and Roy Fugazy moved this Court for summary judgment and for sanctions against the Plaintiffs. Subsequently, both the Trustee and Metromedia, represented by separate counsel, cross-moved for summary judgment and sanctions against the Defendants. In addition, William Fugazy crossed-moved for summary judgment against the Plaintiffs.

## ISSUES

1) Whether summary judgment is proper in this case.

2) Whether the Debtor had any interest in the FCC License for Radio Call Sign KXY 610.

3) Whether the actions of the FCC have any impact on this ruling.

4) Whether there was an improper post-petition transfer of property of the estate under Code § 549(a).

5) Whether the nature and measure of relief that the Trustee and/or Metromedia is entitled to includes costs and attorney's fees, an accounting, and/or an award of monetary damages?

## DISCUSSION

### I. SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure [2] states that summary judgment shall be granted to the moving party if the court determines that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265, 267 (1986). *See also, Anderson v. Liberty Lobby, Inc.,* 477 U.S.

---

**2.** Bankruptcy Rule 7056 provides: "Rule 56 F.R. Civ.P. applies in adversary proceedings."

242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Under Local Bankruptcy Rules [3] a party to a motion for summary judgment is required to set out the material facts as to which no genuine issue exists. Based on the parties 13(h) statements, this Court concludes that there are no material issues of fact which are in dispute, and based on the pleadings and submissions of the parties grants the Plaintiffs' motion for summary judgment as a matter of law. The following discussion details this Court's reasoning in reaching its holding.

## II. FOR THE PERIOD IN QUESTION, THE ESTATE HAD A PROPERTY INTEREST IN THE FCC LICENSE

Section 541(a)(1) of the Code provides:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, *all legal or equitable interests* of the debtor in property as of the commencement of the case.

(emphasis added).

■ In order to reflect the realities of modern commercial life, the concept of property embodied in the Code is clearly and appropriately an expansive and fluid concept which must be defined in connection with the policies underlying the Code. Therefore, at the threshold, it is necessary to examine whether a radio call sign license is "property" of the bankruptcy estate. The bankruptcy estate consists of all property of the debtor including not only tangible personal property, but also intangible property and causes of action. *United*

States v. Whiting Pools, Inc., 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

An FCC license is a permit under the Communications Act (the "Act") [4] which gives the holder the right to broadcast on an assigned frequency consistent with FCC rules and regulations. The purpose of the Act is to regulate the limited number of available radio frequencies. The rights afforded to the license-holder are rights subject to the continuing supervision of the FCC. Section 301 of the Act provides:

It is the purpose of this chapter, among other things, to maintain the control of the United States over the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio ... except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter.

Notwithstanding § 301 of the Act, it has been held that "upon the filing of the Chapter 7 bankruptcy petition, [the] Debtor's interest in [an] FCC license became property of the bankruptcy estate." *In re Smith,* 94 B.R. 220, 221 (Bankr.M.D.Ga.1988). *Smith* is similar to the case at hand in that it concerned whether a creditor possessed a security interest in an FCC license which was the primary asset remaining in the bankruptcy estate. In *Smith,* the court found that an FCC license is property of the estate as a matter of law.

---

**3.** Local Bankruptcy Rule 13(h) provides that upon a motion for summary judgment the moving party is required to submit "a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." The party opposing a motion for summary judgment must include "a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried."

Rule 13(h) further provides that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

**4.** Title 47, United States Code, § 151 *et seq.*

Defendants assert that a license which is subject to regulation by an administrative agency such as the FCC is not property within the purview of § 541 of the Code, and is therefore not subject to the bankruptcy court's jurisdiction. Defendants rely upon *In re D.H. Overmyer Telecasting Co.*, 35 B.R. 400 (Bankr.N.D.Ohio 1983) to support this premise. The court in *Overmyer* held that the debtor's FCC license was not property of the estate as commonly defined, due to the fact that the FCC retained continuing and exclusive jurisdiction over any subsequent transfer of the license by the debtor. *Id.* at 401. Defendants also cite *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983), which held that the debtor's airport landing slots were neither licenses nor property rights, but instead were Federal Aviation rules which imposed restrictions on the use of the debtor airline's property, its airplanes.

However, the rationale of both the *Overmyer* and the *Braniff* cases was rejected by this district in the well reasoned opinion *In re Beker Indus. Corp.*, 57 B.R. 611 (Bankr.S.D.N.Y.1986). In *Beker*, the court found that the debtor's ability to truck phosphate ore on public roads pursuant to an administrative agency's order was a license so as to be property of the estate within the meaning of § 541, stating that:

> Both of these cases [*Overmyer* and *Braniff*] failed to consider either the legislative history to § 541 of the Code which defines property of an estate or *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983), where the Supreme Court, upon examination of that history, observed that "Congress intended a broad range of property to be included in the estate". Following *Whiting Pools* and relying on it, the district court in *Bernstein v. R.C. Williams, Inc. (In re Rocky Mountain Trucking Co.)*, 47 B.R. 1020 (D.Colo.1985) held that a state agency issued certificate of public convenience and necessity enabling a trucking firm to serve as a common carrier throughout the state is property of the estate, even though dormant pursuant to agency rules, and therefore con-

sideration by the commission of post-petition failure to utilize the license was within the automatic stay provided by § 362(a)(3) of the Code. Other courts are in accord in holding similar permits to be property of an estate. *See e.g., In re Golden Plan of California, Inc.*, 37 B.R. 167 (Bankr.E.D.Cal.1984); *In re Hodges*, 33 B.R. 51 (Bankr.E.D.Pa.1983); *In re R.S. Pinellas Motel Partnership*, 2 B.R. 113, 5 B.C.D. 1292, 1 C.B.C.2d 349 (Bankr.M.D.Fla.1979).

*In re Beker Indus. Corp.*, 57 B.R. at 622.

Further, the court in *Beker* specifically rejected the proposition that the mere existence of state or federal regulation precludes property rights from coming within the wide horizon of property of the bankruptcy estate by ruling that:

> To hold otherwise would be to rule ... that a property interest subject to regulation, as nearly all are, or conditioned upon regulatory requirements, is not property of an estate. Such a ruling would contemplate that all licenses and permits issued by governmental units are not property of the estate....
>
> Far more consistent with general Congressional intent as found by *Whiting Pools* is to construe such rights as within the definition of property of an estate, to recognize, as discussed *infra*, that valid regulation continues post-petition as provided in 28 U.S.C. § 959(b) (1978) and to apply the evident Congressional intent, reflected in §§ 362(b)(4) and (b)(5) of the Code that good faith enforcement by governmental units of valid regulation is to be permitted to continue.

*Id.* 57 B.R. at 622.

In addition, this Court finds an opinion of the Bankruptcy Court of the District of Massachusetts persuasive in its analysis of the *Braniff* case. The opinion stated:

> Movant has suggested in a recent pleading that the Fifth Circuit opinion *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983) is authority for his position that the June 30, 1981 order approving the sale of the radio station was error. *Braniff* is not contra authority. The court noted the question of whether 11

U.S.C. § 363(b) authorizes a sale of all of a debtor's assets and cited *In re WHET, Inc., supra,* for the proposition that courts have so construed § 363(b). Immediately thereafter the Fifth Circuit stated: "We need not express an opinion on this controversy because we are convinced that the [subject] transaction is much more than the 'use, sale or lease' of *Braniff's* property authorized by § 363(b)." The court concluded that the Braniff proposal was actually in the nature of a fully integrated plan of reorganization and not just a sale.

*In re WHET, Inc.,* 33 B.R. 424, 429 (Bankr. D.Mass.1983).

In any event, the First Circuit Court of Appeals has recently questioned the continuing applicability of the *Braniff* case because of administrative developments since the decision was rendered. The court stated:

> In light of [14 C.F.R. § 93.221(a)(1989)], which did not exist when the Fifth Circuit decided *In re Braniff,* we must conclude that by granting carriers the right to buy and sell slots with the intent of maximizing reliance on market forces and minimizing government involvement regarding slot distribution, the FAA grants to carriers a limited proprietary interest in slots. *See Continental Air Lines, Inc. v. Hillblom (In re Continental Air Lines, Inc.),* 61 B.R. 758, 784 n. 51 (S.D.Tex.1986). We reached this conclusion despite the FAA's provision that "[s]lots do not represent a property right but represent an operating privilege subject to absolute FAA control...." *See* 14 C.F.R. § 93.223(a) (1989). This declaration by the FAA does not detract from the reality that a market exists in which carriers may buy and sell these slots. We cannot deny that a carrier possesses a proprietary right in allocated slots, even if limited as to the superior rights of the FAA.

*In re Gull Air, Inc.,* 890 F.2d 1255, 1260 (1st Cir.1989). *See also, In re McClain Airlines, Inc.,* 80 B.R. 175, 178 (Bankr.D. Ariz.1987) (debtor possessed property rights in slots, but lost those rights when the FAA had properly and permanently

withdrawn them); *In re American Central Airlines, Inc.,* 52 B.R. 567, 570–71 (Bankr.N.D.Iowa 1985) ("possession of an airport slot also entitles the holder to airport access ..." and that "[s]uch a possessory interest must constitute property of the estate."). Thus, at the very least, the Debtor had a proprietary interest in the License even if limited by the regulatory authority of the FCC. This proprietary interest is not subject to defeasance by the extra-legal activities of William Fugazy, Roy Fugazy, and Limousine.

■ Finally, this Court has, pursuant to its Consent Order, already determined *vis-a-vis* the Trustee, William Fugazy, Roy Fugazy, and Limousine the issue of whether the License is property of the debtor's bankruptcy estate. That very premise was implicit in the order entered in this case on September 10, 1987 which declared that the purported assignment and transfer of the License by William Fugazy to Limousine was null and void. The License, a valuable economic asset, is clearly subject to the Chapter 7 Trustee's equitable power of marshalling assets for the benefit of creditors. It is undisputed that the License is a right or interest subject to regulation, but pursuant to § 541 of the Code, the interest that the Debtor had in the License became property of the estate upon the filing of the bankruptcy petition.

## III. THE ACTIONS TAKEN BY THE FCC

Although the FCC is not a party to this adversary proceeding, and the question of a violation of the automatic stay by the FCC is not before this Court, the Defendants seek to use the post-transaction administrative actions of the FCC in an attempt to validate prior acknowledged impermissible conduct and to bolster their arguments for summary judgment. Accordingly, the discussion which follows is only for the purpose of dealing with the Defendant's arguments, and is not determinative of the validity of the FCC actions as they are impacted by the application of the automatic stay.

Section 362 of the Code, in pertinent part, states:

(a) Except as provided in subsection (b) of this section, a petition filed under Section 301, 302, or 303 of this title operates as a stay, applicable to all entities, of-

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\* \* \* \* \* \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

\* \* \* \* \* \*

(b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), does not operate as a stay—

\* \* \* \* \* \*

(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power....

5. § 90.157 Discontinuance of station operation.

(a) If a station licensed under this part discontinues operation on a permanent basis, the licensee shall forward the station license to the Federal Communications Commission, Gettysburg, Pennsylvania 17325 for cancellation. Alternatively, the licensee may notify the Commission by checking the appropriate box on Form 405–A that he/she has discontinued station operation and requests license cancellation. The form 405–A shall be sent to the Commission's offices in Gettysburg, Pennsylvania.

(b) Licensees whose licenses are due for renewal and who have received the Form 574–R in the mail from the Commission, shall use the appropriate box on that Form the [sic] notify the Commission that they have discontinued station operation and wish to cancel their license.

The Defendants have moved for summary judgment alleging that the License was forfeited upon the cessation of Debtor's business on December 31, 1986, and that such automatic defeasance prevented any further transfer of the License to the Trustee as part of the bankruptcy estate.

Defendants admit that William Fugazy transferred the License to his son Roy Fugazy's limousine business sometime after filing a voluntary Chapter 11 petition on July 8, 1986. However, they now contend that the FCC letter of October 26, 1988, approximately a year and a half later, rendered the License worthless as of Debtor's cessation of business. That letter stated that since the Debtor ceased operations in December 1986, under 47 C.F.R. § 90.157 [5] radio call license KXY 610 was cancelled.[6]

The FCC purportedly established that use of the License had "ceased" in December, 1986. FCC Regulation § 90.157 (see, footnote 5) states that a license is not cancelled until the licensee has notified the FCC of a permanent discontinuance of operations, or that the station has not operated for a period of one year. Here, there has been no indication that the FCC was ever notified of a "permanent discontinuance" or that the dormant period had run. In addition, the presumption occasioned by non-operation for one year has no bearing on this case since the auction of the License took place on June 18, 1987, less than six months after the date on which the FCC

(c) For the purposes of this section, any station which has not operated for 1 year or more is considered to have been permanently discontinued.

6. The letter from the FCC dated October 26, 1988, stated:

Affidavits submitted with the pleadings establish that KXY–610 ceased operations in December, 1986. Under Section 90.157 of our Rules, 47 C.F.R. § 90.157, the license for KXY–610 has therefore cancelled and must be returned to the Commission.

It should be noted the neither the letter nor § 90.157 (see footnote 5) specifies when the effective date of cancellation is under the FCC Regulations. In this case, it could have been the date of the FCC letter, one year after the discontinuance of operations, or the date of the discontinuance of operations.

determined the use of the License had ceased. Further, Limousine continued to use the Debtor's License, although it had obtained no court authority to do so. Indeed, continuous use was maintained by the usurper, and therefore, on the date of the sale of the License by the Trustee, the License was property of the estate.

The Second Circuit has recently considered the breadth of the automatic stay pursuant to Code § 362(a) as it applies to governmental entities. In *In re Parr Meadows Racing Association, Inc.*, 880 F.2d 1540 (2d Cir.1989), the court, in discussing one of the paramount policies of the Code, equality of distribution to all creditors, stated that "[t]his equitable treatment requires that all creditors, both public and private be subject to the automatic stay." *Id.* at 1545.

■ As quoted above, pursuant to § 362(a)(3) of the Code, the automatic stay applies to all entities and operates to prevent an administrative proceeding against the debtor, unless the exception in Code § 362(b)(4) is applicable. Code § 362(b)(4) is a very limited exception to the automatic stay. The legislative history states:

> This section is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate.

124 Cong.Rec. H11,092 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); 124 Cong.Rec. S17,409 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini). Therefore, the FCC, an administrative agency, was stayed from rendering any administrative cancellation of the license without first moving for relief from the automatic stay. In *In re Rocky Mountain Trucking Co., Inc.*, 47 B.R. 1020 (Bankr.D.C.Colo.1985) the court held that "[c]onsideration of post-petition non-use of the Certificate in the determination of whether the Certificate is now dormant *is* an act to obtain property of

the estate, and is therefore stayed." *Id.* at 1021 (emphasis added).

■ In the present case, at the time of the filing the License was property of the Debtor's estate and had remained so. The FCC was subject to the automatic stay and precluded from rendering any administrative cancellation of the License once the Debtor filed a petition in bankruptcy, unless the action was taken to protect the public health or safety.[7] Since § 362 of the Code stays all enforcement activity automatically, the 1988 FCC letter is accordingly without effect. *See e.g., In re Garnett*, 47 B.R. 170 (Bankr.E.D.N.Y.1985). Thus the License remained property of the estate, even though administratively it became subject to cancellation.

If this Court were to adopt Defendant's argument giving retroactive effect to the FCC's 1988 letter cancelling the License, the result would be an inappropriate cure for a violation of the automatic stay. The Defendant's present contention that the license was forfeited upon Debtor's cessation of business, and thus somehow metaphysically evaporated from the estate, is without merit. This case is factually distinguished from *In re Gull Air, Inc., supra,* in which the court held that an *automatic, nondiscretionary* act of the FAA did not violate the automatic stay. *Id.* 890 F.2d at 1261. Here, if the FAA's letter of October 26, 1988 were to have any effect, it would have to be interpreted as a retroactive post-petition determination that the License's use had been permanently discontinued as of December, 1986. That finding would involve a determination of intent, which is clearly not an automatic, nondiscretionary act. Given that the purchaser, Metromedia, is a well-known communications entity, the FCC would be hard pressed to find a timely transfer to it as constituting an intent to keep the use of the License dormant.

A radio call sign license is an economic asset subject to regulation in the public interest by the FCC. In a case similar to the present one, *LaRose v. F.C.C.*, 494 F.2d

---

**7.** There has been no suggestion in the record that the FCC actions in regard to cancelling the Debtor's FCC License was in any way prompted by a concern for the public health or safety.

1145 (D.C.Cir.1974), the court stated that "the Commission [FCC] has gradually evolved a special policy for the disposition of a license held by a trustee in bankruptcy." 494 F.2d at 1147. The *LaRose* Court went on to say that:

> [I]n recognition of the public interest in protecting innocent creditors, the Commission will approve the sale and assignment of the bankrupt's license when the transaction will not unduly interfere with the F.C.C. mandate to insure that broadcast licenses are used and transferred consistently with the Communications Act.

*Id.* at 1148. As stated in *LaRose*, the FCC could approve the sale or assignment to Metromedia as long as it was transferred consistent with the Act, and this was a valuable interest held by the estate that should not be lost absent this Court's grant of relief from the automatic stay. *Id.* at 1147.

To the extent that the FCC may have acted in derogation of the automatic stay, that activity has no impact on the outcome here. Neither the Plaintiffs nor the Defendants have made the FCC a party to this proceeding, and instead, Plaintiffs have opted to appear before the FCC to seek to strip Roy Fugazy and Limousine of the License. In any event, the FCC recognized the doubtful validity of the purported assignment (*See,* FCC letter of October 26, 1988) and instead based its license grant to Limousine on a presumed lapse of use. While this determination may now be binding upon the parties, it is irrelevant to this Court's assessment of rights, liabilities, and damages left in the wake of the original illegal and defective transaction.

## IV. THE POSTPETITION TRANSFER OF THE LICENSE WAS IMPROPER

Section 549(a) of the Bankruptcy Code provides:

> (a) Except as provided in subsections (b) or (c) of this section, the trustee may avoid a transfer of property of the estate-
>
> > (1) made after the commencement of the case; and

> > (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
> >
> > (B) that is not authorized under this title or by the court.

This Court has already found that William Fugazy's conduct represented a clear violation of Code § 549(a)(2)(B). The Consent Order dated September 10, 1987 was dispositive of William Fugazy's liability to Metromedia for improperly transferring the License during the bankruptcy proceeding. Once the bankruptcy petition is filed, a debtor may not transfer assets out of the ordinary course of business without court approval. *See,* 11 U.S.C. § 363.

The Consent Order signed by this Court on September 10, 1987, declared that the post-petition transfer of the License violated the automatic stay and was void *ab initio. In re 48th Street Steakhouse, Inc.,* 835 F.2d 427, 431 (2nd Cir.1987), *cert. denied,* 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1989) ("Judge Brozman correctly held that Landlords termination notice violated the automatic stay ... and was therefore void."); *In re Smith,* 876 F.2d 524, 526 (6th Cir.1989); *Morgan Guaranty Trust Company of New York v. American Savings and Loan Association,* 804 F.2d 1487, 1490 (9th Cir.1986) *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1989). *Contra, Sikes v. Global Marine, Inc.,* 881 F.2d 176, 178 (5th Cir.1989) ("We are persuaded that the better reasoned rule characterizes acts taken in violation of the automatic stay as voidable rather than void."); *see, In re Albany Partners Ltd.,* 749 F.2d 670, 675 (11th Cir. 1984); *In re Smith Corset Shops, Inc.,* 696 F.2d 971, 976 (1st Cir.1982); *In re Matthews,* 739 F.2d 249, 251 (7th Cir.1984). The undisputed liability of the transferor, William Fugazy, for the improper transfer of the License is thus a settled matter of the law of this case.

Further, § 549(a) of the Code clearly states that post-petition transfers of property of the estate are voidable by the trustee. This Court must therefore also determine the liability of Limousine and Roy Fugazy for the receipt and continued unauthorized use of the license. When they

received the License, Roy Fugazy, on behalf of himself and Limousine, knew that the Debtor was involved in bankruptcy proceedings and was subject to the requirements of the Code. At the time the Debtor filed its petition, Roy Fugazy was the Vice President of Marketing, although he was dismissed shortly after the filing. He thus knowingly received and used the License and was possessed of full knowledge of the limitations imposed by the bankruptcy filing.

## V. DAMAGES

■ At the time of the court-ordered sale of the License by the Trustee to plaintiff Metromedia, the License was property of the estate, although Limousine was using the License and was continuing to profit from it.[8] Section 550 of the Code states:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

Section 550 clearly contemplates recovery not only of the physical asset itself, but also of the value derived from the asset. Code § 541(a)(6) specifically enumerates that the "estate is comprised of ... [p]roceeds, product, offspring, rents, or profits of or from property of the estate."

■ Code § 362(h) states "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."[9] For

there to be an act in contravention of § 362(h) of the Code there must first exist property of the estate. Here, Roy Fugazy and Limousine profited from the use of the License at least from the date of the attempted assignment from William Fugazy, and continued to do so even after the Consent Order was signed on September 10, 1987 which:

ORDERED that R.D.F. Corp. [Limousine] acquired no legal or equitable rights or interests with respect to the F.C.C. License by virtue of said assignment and transfer by William D. Fugazy....

This was in direct, willful contravention of § 362(a)(3) of the Code, and Roy and Limousine should be required to answer for their conduct pursuant to § 362(h).

■ The quantum of damages is to be measured by the gravity of the circumstances attendant to the unauthorized transfer and by the amount of unauthorized use by the debtor. In *In re Heafitz*, 85 B.R. 274, 282 (Bankr.S.D.N.Y.1988) the court considered the attorneys' degree of sophistication and familiarity with the broad application of the automatic stay, and concluded that "the debtor had acted with arrogant defiance of the law", and imposed attorneys' fees, costs, and punitive damages.

The case at bar presents serious misconduct by the Debtor through its former Chairman together with connivance by a willing transferee in a less than arms-length transaction. The continued unwarranted use of an asset of the Debtor by the business of a son of the former Chairman makes sanctions appropriate in this case. Roy Fugazy's and Limousine's knowing and willful use of the License will result in damages being assessed against them including costs, attorneys' fees, and damages based on an accounting of the revenue received as a result of the unauthorized use of the License.

---

**8.** Defendant's Answer, ¶ 18: "[R.D.F. Corp.] has earned income and derived profit from its (sic) license."

**9.** For an extensive discussion of § 362(h), *See Maritime Asbestosis Legal Clinic v. LTV Steel*

*Company, Inc.,* 112 B.R. 526 (S.D.N.Y.1990). *See also, In re Crysen/Montenay Energy Co.,* 902 F.2d 1098 (2nd Cir.1990) (award of damages not warranted under special circumstances of the case).

■ Although the Plaintiffs are entitled to the revenue derived from the unauthorized use of the License by Roy Fugazy and Limousine, the amount of that revenue has not been specified. The remedy of an accounting as provided under New York law is available where special circumstances are present warranting equitable relief in the interest of justice. *Grossman v. Laurence Handprints—N.J., Inc.,* 90 A.D.2d 95, 455 N.Y.S.2d 852 (2d Dept.1982). Further, this remedy becomes available once the underlying right has been established. *Kaminsky v. Kahn,* 23 A.D.2d 231, 240, 259 N.Y.S.2d 716 (1st Dept.1965); *Wishman v. Genesee—Monroe Racing Assn., Inc.,* 43 A.D.2d 785, 349 N.Y.S.2d 1009 (4th Dept.1973).

■ In the present case, the prerequisites for the remedy of an accounting under New York state law and Code §§ 362(h), 549 and 550 have been sufficiently proven. William Fugazy wrongfully assigned the License to his son's limousine business. The invalidity of the transfer has been established as well as the subsequent unauthorized use and profit from the License. Thus, Roy Fugazy and Limousine are to be held accountable for all revenue attributable to their use of the License. In the hearing conducted on October 27, 1987, this Court stated that the Trustee and Metromedia are both entitled to an accounting,[10] but noted a lack of specificity regarding the exact dates during which there must be an accounting. Accordingly, Roy Fugazy and Limousine are directed to file an accounting with this Court detailing all revenues attributable to their use of the License. They are required to account to the Trustee for revenue attributable to the License during the period from the date of their initial use through June 18, 1987 (the date of the Court-ordered auction), and the Trustee shall have judgment therefore. Roy Fugazy and Limousine are also required to account to Metromedia for revenue attributable to the License from the date of the auction to present, and Metromedia shall have judgment therefore.

10. Hearing Transcript, October 27, 1987 p. 21.

While William Fugazy is not liable for any damages to Metromedia under the terms of the September 10, 1987 Consent Order, he has not been released from liability to the Trustee, and therefore, is required to pay one-third of the costs and attorneys' fees of the Trustee relative to the License litigation through the date of the Consent Order. The balance of costs and attorneys' fees that the Plaintiffs incurred with respect to the proceedings in this Court involving the License shall be borne equally by Roy Fugazy and Limousine.

Although it might be appropriate under the circumstances to require the payment of further consequential damages in the form of costs and attorneys' fees incurred by Plaintiffs in the proceedings before the FCC, this Court has not been given any information as to the expenses, or time and effort expended in the administrative proceedings. Further the Plaintiffs voluntarily sought relief in that forum in addition to the pursuit of remedies sought in this forum. Accordingly no award for the costs and expenses incurred in the FCC proceedings shall be granted.

## CONCLUSION

In accordance with the foregoing discussion, the Plaintiff's Cross–Motion for Summary Judgment is granted and the other Motions for Summary Judgment are denied.

Submit an Order, consistent with and implementing this decision.